IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | |
|---|---|
| AMBER SWANN, ) | |
|     PLAINTIFF, ) | |
| ) | |
| V. ) | |
| ) | Civil Action No.: |
| TAYLOR COUNTY, GEORGIA, ACTING ) | |
| THROUGH ITS BOARD OF ) | JURY TRIAL DEMANDED |
| COMMISSIONERS., ) | |
|     DEFENDANT. ) | |
| ) | |
| ) | |

## INTRODUCTION

1. Defendant Taylor County, acting through the Taylor County Board of Commissioners (collectively, "Taylor County"), terminated Plaintiff Amber Swann's employment because she reported the County's unlawful hiring and pay practices, in violation of the Georgia Whistleblower Act and the Equal Pay Act. Taylor County compounded these unlawful actions by refusing to grant Ms. Swann a pretermination hearing to which she was entitled, in violation of 42 U.S.C. § 1983. This lawsuit for injunctive relief and damages follows.

## PARTIES, JURISDICTION, AND VENUE

2. Ms. Swann is a resident of Taylor County, Georgia and submits herself to the jurisdiction of this Court.

3. Taylor County Taylor County is a Georgia County created and operating under the laws of the state of Georgia.

4. Taylor County's principal place of business is located at 7 Ivy Street, Butler, Georgia, 31006.

5. This Court has original jurisdiction over the Complaint under 28 U.S.C. § 1331 because Ms. Swann alleges violations of federal law.

6. This Court also has jurisdiction over Ms. Swann's state law claims under 28 U.S.C. § 1367(a) because those claims are so related to Ms. Swann's federal claims that they form part of the same case or controversy under Article III of the U.S. Constitution.

7. Venue is proper in this Court because the events giving rise to Ms. Swann's Complaint arose from acts and omissions that occurred within Taylor County, Georgia.

8. This action has been brought within the timeframe provided by O.C.G.A. §§ 36-11-1, 45-1-3, and 50-21-26.

## CONDITIONS PRECEDENT

9. Any and all conditions precedent to filing suit have been satisfied. Ms. Swann delivered an ante-litem notice to Taylor County and the Risk Management Division of the Department of Administrative Services on October 7, 2024. Attached as Exhibit A is a copy of the notice of claim presented to Taylor County, the Members of Taylor County's Board of Commissioners, and the Department of Administrative Services.

## TAYLOR COUNTY HIRES MS. SWANN

10. Taylor County hired Ms. Swann in June 2022 as Planning and Zoning Assistant Director. In that role, Ms. Swann was paid $16.00 per hour and reported to Lenda Taunton, County Manager.

11. As an employee of Taylor County, Ms. Swann was subject to the policies, procedures, rules, and protections as set forth in the Taylor County Personnel Policies and Procedures Manual.

12. Among those protections is protection from termination, other than for "just cause."

13. As set out explicitly in the Taylor County Personnel Policies and Procedures Manual, dismissals "shall constitute discharges or separations for just cause." These limited enumerated reasons for just cause are laid out in detail in the Taylor County Personnel Policies and Procedures Manual, which is attached hereto as Exhibit B.

14. When Ms. Swann was hired, Rex Robinson served as the Taylor County Planning and Zoning Director. On information and belief, the plan was for Ms. Swann to replace Mr. Robinson when he retired.

15. In December 2022, Mr. Robinson went out on a medical leave and unfortunately was unable to return to work.

**TAYLOR COUNTY FAILS TO FOLLOW ITS HIRING PROCESSES WHEN INSTALLING JOE CARROLL AS CODE ENFORCER AT THE BEHEST OF RANDY NELSON, COUNTY COMMISSIONER AND MR. CARROLL'S FATHER-IN-LAW**

16. More than eight months went by and Mr. Robinson's role remained unfilled. Then, in August 2023, Ms. Taunton called Ms. Swann into her office and stated that Taylor County had just hired someone to work as a Code Enforcer.

17. Ms. Swann was confused about this new hire, as the Taylor County Personnel Policies and Procedures Manual plainly provides thus:

> Announcement of Vacant Positions: Except as otherwise provided below, all vacancies in the classified service shall be publicized by posting announcements in the office of the County Administrator or on the official bulletin board or in other places and by such other means as the County Administrator deems advisable.

18. No such posting had been made.

19. Just as importantly, the Taylor County Personnel Policies and Procedures Manual further provides thus:

<u>Employment Requirements</u>: All positions in the classified service shall be open only to persons who meet such requirements as are listed on the public announcement of the examination. Such requirements may include but are not limited to the following factors: experience, education, and training.

20. Because no such posting was made, there was no way to measure whether the person who had been hired met any of the requirements for the Code Enforcer role. And it turns out, they did not.

21. Indeed, about a week later, on August 14, 2023, Joe Carroll started work as the Code Enforcer for Taylor County. Mr. Carroll was placed in the same office space as Ms. Swann. Both Mr. Carroll and Ms. Swann reported directly to Ms. Taunton, County Manager.

22. Ms. Taunton directed Ms. Swann to train Mr. Carroll in his role because he had no experience in Code Enforcement.

23. In an interesting coincidence, Mr. Carroll's father-in-law is Randy Nelson, County Commissioner. This connection might explain why the Code Enforcer role was never posted, in violation of the Taylor County Policies and Procedures Manual.

24. Two days later after Ms. Carroll started working, on August 16, 2023, Ms. Swann was "promoted" to Planning and Zoning Director. This promotion did not come with a pay raise.

25. Because the promotion did not come with a pay raise, Ms. Swann asked Ms. Taunton for a pay increase. Ms. Taunton said "no."

## **MS. SWANN MAKES HER FIRST PROTECTED DISCLOSURE AND NOTHING IS DONE**

26. Frustrated, Ms. Swann reported to Tameka Harris, County Commissioner, that Mr. Carroll's hire obviously failed to comply with the Taylor County job posting requirements. During that same conversation, Ms. Swann also asked that her recent promotion include a pay increase.

27. Ms. Harris agreed with Ms. Swann that the process seemed unfair and promised to look into what had happened.

28. Not long thereafter, Ms. Taunton announced that she planned to retire. Unlike the Code Enforcer position that was filled by fiat, the role of County Manager was posted publicly, in conformance with the Taylor County Policies and Procedures Manual.

29. In September 2023, raises were announced, and Ms. Swann received a $1.00 pay raise, up to $17.00 per hour.

30. In October 2023, an announcement was made that Amanda Queen had been hired as the new County Manager, effective November 1, 2023, and that Ms. Taunton would serve in a consulting role while Ms. Queen got up to speed.

31. While all of this was going on, Ms. Swann learned that Mr. Carroll, who was placed into the Code Enforcer role despite the position never having been posted (and who Ms. Swann was forced to train), was earning $4.00 more per hour than Ms. Swann. This was particularly disconcerting because Ms. Swann and Mr. Carroll were by all accounts in roles with substantially identical responsibilities and reported directly to the County Manager.

## MS. SWANN MAKES HER SECOND PROTECTED DISCLOSURE AND NOTHING IS DONE

32. Ms. Swann was surprised and dismayed to learn that Mr. Carroll was earning significantly more than her. For that reason, on or around November 29, 2023, Ms. Swann complained to Ms. Queen that Mr. Carroll was being paid $4.00 more than she was for doing the same work.

33. On November 30, 2023, Ms. Queen told Ms. Swann that she'd be getting a raise, but that Ms. Queen didn't know 1) how much it would come to; or 2) when the raise would process.

34. In early January 2024, Ms. Queen held a meeting during which she announced that Ms. Taunton's consultancy had ended. Ms. Queen further stated that she hoped to make some positive changes to the working environment in the coming months.

35. Later in January, Ms. Swann asked Ms. Queen whether Mr. Carroll could move out of her office, as she'd trained him over the past five months. Ms. Queen agreed, so Mr. Carroll moved into his own office space soon thereafter.

36. From approximately February 8 through 10, 2024, Ms. Swann and Mr. Carroll attended a work conference together in Athens, Georgia. During a break in activities, Mr. Carroll confided to Ms. Swann that Mr. Nelson, the County Commissioner, was his father-in-law. Mr. Carroll further explained to Ms. Swann that Mr. Nelson had told Mr. Carroll he'd secured a job for Mr. Carroll as Code Enforcer, and that Mr. Carroll would be paid $21.00 per hour. Mr. Carroll also sheepishly admitted that, when he was hired, he had no idea what a Code Enforcer did and didn't know what he would be doing in the role. Mr. Carroll further stated that he felt bad when he learned he was making significantly more money than Ms. Swann and others. Indeed, Mr. Carroll made $5.00 more per hour than Ms. Swann when he was hired, which comes out to about $10,000 per year.

37. On or around April 1, 2024, in the middle of the workday, Ms. Swann overheard Mr. Carroll speaking with an individual over the phone who was trying to secure a permit. From the discussion, it was evident to Ms. Swann that Mr. Carroll did not know how to handle the situation, so Ms. Swann came over and wrote down some questions on a sticky note that she suggested Mr. Carroll ask the caller. For reasons that remain unclear, Mr. Carroll ignored Ms. Swann's suggestions and hung up the phone. When asked why he'd failed or refused to ask the

questions Ms. Swann recommended he ask, Mr. Carroll simply shrugged and responded, "I don't know."

38.     Concerned that Mr. Carroll seemed not to understand how to do his job, Ms. Swann expressed to Ms. Queen that she felt that Mr. Carroll was not fit for his role. Teresa Winsor, Purchasing Agent, was present for this conversation. Both Ms. Winsor and Ms. Queen readily agreed that Mr. Carroll was not capable of performing the basic functions of his position.

39.     Even so, Mr. Carroll was not disciplined, nor was his ongoing substandard performance otherwise documented.

40.     Unfortunately, and predictably, Mr. Carroll's perceived performance problems continued apace. On May 2, 2024, Ms. Queen expressed frustration to Ms. Swann that Mr. Carroll had called out sick, even though, in Ms. Queen's estimation, Mr. Carroll did not seem to be sick.

## MR. CARROLL VERBALLY HARASSES MS. SWANN

41.     Things only got worse. On June 26, 2024, at approximately 8:30 a.m., Mr. Carroll stormed into Ms. Swann's office with his chest puffed out and began yelling that Ms. Swann was "full of shit," while pointing his finger aggressively. Mr. Carroll moved to close Ms. Swann's door as he was yelling at her (likely to try and avoid having any witnesses to his inappropriate and harassing behavior). Ms. Swann refused to let him do so and made sure that Teresa Winsor and Benira Hudgens could hear everything. The confrontation ended soon after.

42.     The next day, on June 27, 2024, Ms. Swann submitted a written report regarding Mr. Carroll's inappropriate, aggressive behavior to Teresa Blackston and the HR team. Ms. Blackston and Ms. Queen subsequently met with Ms. Swann and stated the situation would be "handled." On information and belief, Mr. Carroll was written up for this untoward behavior.

43.     Also on June 27, 2024, Ms. Queen told Ms. Swann that she'd be getting a raise, which would bring her pay up to $20.00 per hour. During that conversation, Ms. Queen readily acknowledged that Ms. Swann was still not being paid as much as Mr. Carroll, even though they were peers.

44.     This ongoing pay disparity, importantly, is not just unlawful but also runs contrary to Taylor County's own policies. Indeed, the Taylor County Personnel Policies and Procedures Manual explicitly provides that new employees will be "paid at the minimum rate of pay for the class to which they are assigned." Obviously, that wasn't the case with Mr. Carroll, who came in earning $5.00 more per hour than Ms. Swann.

45.     Even if Mr. Carroll had exceeded the minimum qualifications for the Code Enforcer role, he only would have been eligible to be placed in a salary band above the minimum rate upon approval of the County Administrator. On information and belief, no such approval was requested or received.

## MS. QUEEN RETALIATES AGAINST MS. SWANN FOR RAISING CONCERNS ABOUT PAY DISPARITIES

46.     On July 10, 2024, Ms. Queen convened a staff meeting. Ms. Swann, Pam Harris, Mr. Carroll, Ms. Blackson, Sharon Woods, Emily Dunson, and Ms. Winsor were in attendance, as well as others. The meeting quickly devolved into a bizarre airing of grievances by Ms. Queen.

47.     To start the meeting, Ms. Queen read off some policies about harassment and sabotage, then chided staff for raising concerns about employees who arrived late to work or stole time. Then, in what appeared to be a misguided attempt to explain workplace harassment, Ms. Queen pointed to Ms. Dunson and stated that it was common knowledge that Ms. Dunson,

who is Caucasian, is married to a man of "another race," and it's not appropriate to ask about the race of her baby. No one said a word. The awkwardness was palpable.

48. Continuing her tirade, Ms. Queen then turned her anger towards Ms. Swann. In front of everyone, Ms. Queen purported to take Ms. Swann to task because Ms. Swann raised concerns that Mr. Carroll was paid a higher wage than her. In other words, Ms. Queen retaliated against Ms. Swann in a public meeting because Ms. Swann complained she was paid less than Mr. Carroll for doing the same work. The meeting ended soon after.

49. Less than two weeks later, on July 27, 2024, Ms. Queen called Ms. Swann to discuss the status of Ms. Swann's department's budget. During that call, Ms. Queen further admitted that she and the Board of Commissioners had planned to give Ms. Swann a raise, but decided not to because Ms. Swann complained that she was paid less than Mr. Carroll.

50. In other words, Ms. Queen readily disclosed that she and the Board of Commissioners rescinded a planned raise to retaliate against Ms. Swann for asking for more money.

## MS. QUEEN RETALIATES AGAINST MS. SWANN BY TERMINATING MS. SWANN'S EMPLOYMENT

51. A little over a month after that, on September 12, 2024, Mr. Carroll again barged into Ms. Swann's office and began yelling at her while pointing his finger in her face, which is the exact same gross and harassing behavior he'd displayed less than three months earlier. Ms. Winsor was in earshot and, on information and belief, heard the entire tirade.

52. At about 4:10 p.m. on September 12, 2024, Ms. Swann submitted a written complaint to Ms. Blackston regarding Mr. Carroll's harassing and aggressive behavior, just like she'd done after the prior incident with Mr. Carroll a few months back.

53. Less than 10 minutes later, Ms. Queen stormed into Ms. Swann's office, holding the complaint that Ms. Swann had just given to Ms. Blackston in her hand and told Ms. Swann that she was fired for complaining about Mr. Carroll.

54. Thereafter, in a Separation Notice issued to the Georgia Department of Labor, Ms. Queen purported to aver that Ms. Swann was terminated for making a false statement. This reason provided by Ms. Queen is patently false and was listed only because Ms. Queen evidently was belatedly made aware that Ms. Swann, as an employee of Taylor County, was covered by "just cause" termination protections as set out in the Taylor County Personnel Policies and Procedures Manual.

55. Since that time, and in violation of the Taylor County Personnel Policies and Procedures Manual, Ms. Swann has not been afforded a pretermination hearing to which she is entitled.

## COUNT I

## RETALIATION UNDER THE GEORGIA WHISTLEBLOWER ACT

## O.C.G.A. § 45-1-4

56. Ms. Swann restates and incorporates by express reference all preceding paragraphs as if fully set out herein.

57. Taylor County is an employer for purposes of the Georgia Whistleblower Act.

58. Ms. Swann was employed by Taylor County and was covered by the protections set out in the Georgia Whistleblower Act.

59. Beginning in August 2023 and continuing through the termination of her employment, Ms. Swann made a host of protected disclosures to Taylor County, including, but not limited to:

    a.   Informing Tameka Harris, member of the Board of Commissioners, in or around August 2023, of her concerns that Mr. Carroll had been hired unfairly and not in conformance with Taylor County's enumerated procedures;

    b.   Informing Amanda Queen, County Manager, in November 2023 that it was unfair that Mr. Carroll was paid more than she was, and that he was likely hired illegally; and

    c.   Regularly asking Ms. Queen for pay increases so that she would at least be paid the same as Mr. Carroll, who was being paid outside the salary bands laid out in the Taylor County Personnel Policies and Procedures Manual.

60.    There is no question that Taylor County knew of Ms. Swann's protected conduct.

61.    Yet rather than making things right, paying Ms. Swann what she was owed, or otherwise investigating the illegal circumstances surrounding Mr. Carroll's hire, Taylor County, through County Manager Amanda Queen and others, retaliated against Ms. Swann for making protected complaints by, among other things:

    a.   Berating Ms. Swann during the July 10, 2024, meeting in front of the entire staff for asking to be paid commensurately with Mr. Carroll, as the Taylor County Personnel Policies and Procedures Manual demands;

    b.   Admitting to Ms. Swann that Taylor County had planned to give her a pay increase, but decided not to because Ms. Swann asked for a raise; and

    c.   Terminating Ms. Swann's employment.

62.    Taylor County's purported reason for termination is also pretextual. When terminating Ms. Swann's employment, Ms. Queen explicitly stated that she was firing Ms. Swann because she continued to complain about Mr. Carroll. Ms. Windsor overheard this. Yet later, in a clumsy attempt to establish that Ms. Swann's termination was supported by "just cause," Ms. Queen changed her tune and stated that Ms. Swann was terminated for making a "false statement."

63.    In other words, Ms. Queen changed her tune about the supposed reason for Ms. Swann's termination, which plainly establishes pretext as a matter of law.

64. This unlawful retaliation, including but not limited to terminating Ms. Swann's employment for making protected disclosures, runs roughshod over the protections afforded to Ms. Swann through the Georgia Whistleblower Act.

65. As a direct result of Taylor County's unlawful retaliatory conduct, Ms. Swann has suffered lost compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation, and other indignities.

66. Taylor County's actions were willful, wanton, and intentionally directed to harm Ms. Swann.

67. Taylor County's actions were reckless and were taken in willful disregard of the probable consequences of its actions.

68. Ms. Swann is entitled to an award of back pay and benefits, front pay, injunctive relief, compensatory damages, attorneys' fees, and all other appropriate damages, remedies, and other relief available under the Georgia Whistleblower Act.

## COUNT II

## DISPARATE TREATMENT UNDER THE EQUAL PAY ACT

## 29 U.S.C. § 206

69. Ms. Swann restates and incorporates by express reference all preceding paragraphs as if fully set out herein.

70. Taylor County is an employer covered by the Equal Pay Act.

71. Ms. Swann is an employee subject to the Equal Pay Act's protections.

72. Ms. Swann and Mr. Carroll performed substantially the same work and that required substantially identical skill, effort, and responsibility under similar working conditions.

73. Indeed, Ms. Swann trained Mr. Carroll and shared an office with him for a time. Both of them interacted with citizens of Taylor County daily. And in fact, Ms. Swann regularly sought to coach Mr. Carroll regarding his interactions with the citizens he was supposed to serve.

74. Beyond that, Ms. Swann and Mr. Carroll both reported directly to Ms. Queen, County Manager.

75. In spite of all of this, when hired, Mr. Carroll was paid $5.00 more per hour than Ms. Swann, in violation of the Equal Pay Act.

76. No factor "other than sex" explains this pay disparity. Mr. Carroll was paid more because he is a male.

77. Just as importantly, none of the Equal Pay Act's other enumerated defenses apply here.

78. There was no seniority system in place, and even if there was, Ms. Swann was more senior than Mr. Carroll.

79. As for a merit system, the Taylor County Personnel Policies and Procedures Manual lays out exactly how Taylor County's employees are to be paid. As pleaded above, Mr. Carroll was paid outside of that proscribed scheme.

80. There was no system in place that measured "quantity or quality of production," as those terms are laid out in the Equal Pay Act.

81. As a direct and proximate cause of Taylor County's unlawful failure or refusal to pay Ms. Swann the same as Mr. Carroll for performing equal work, Ms. Swann is entitled to back wages and compensatory damages in an amount to be determined at trial.

82. Taylor County's unlawful failure or refusal to pay Ms. Swann the same as Mr. Carroll for performing equal work was plainly willful and runs contrary to the pay scheme set

out in the Taylor County Personnel Policies and Procedures Manual. For that reason, Ms. Swann is entitled to liquidated damages.

83. On top of that, based on Taylor County's failure or refusal to comply with the law, Ms. Swann is entitled to her attorney's fees and costs.

## COUNT III

## RETALIATION UNDER THE EQUAL PAY ACT

## 29 U.S.C. § 215

84. Ms. Swann restates and incorporates by express reference all preceding paragraphs as if fully set forth herein.

85. Taylor County is an employer covered by the Equal Pay Act.

86. Ms. Swann is an employee subject to the Equal Pay Act's protections.

87. Ms. Swann repeatedly engaged in protected activity under the EPA when she raised concerns to Ms. Queen and others that Mr. Carroll was paid more than her.

88. Ms. Swann also engaged in protected activity when she asked to be paid more money.

89. There is no question here that Taylor County knew of Ms. Swann's repeated protected acts.

90. There is also no question that Ms. Swann suffered multiple adverse actions.

91. For example, during the July 27, 2024, phone call between Ms. Queen and Ms. Swann, Ms. Queen explicitly stated that Taylor County had planned to provide Ms. Swann with a pay raise, then changed their plan literally because Ms. Swann continued to ask for more money.

92. Worse still, Taylor County's retaliatory treatment of Ms. Swann culminated when Ms. Queen terminated Ms. Swann's employment 10 minutes after Ms. Swann raised a complaint

against Mr. Carroll (and only six weeks after Ms. Queen admitted to Ms. Swann that her raise had been withheld because she'd engaged in protected conduct.

93. In addition, as pleaded above, Taylor County's purported reason for its termination is a pretext for unlawful retaliation.

94. As a direct result of Taylor County's unlawful retaliatory conduct, Ms. Swann has suffered lost compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation, and other indignities.

95. Taylor County's actions were willful, wanton, and intentionally directed to harm Ms. Swann.

96. Taylor County's actions were reckless and were taken in willful disregard of the probable consequences of its actions.

97. Ms. Swann is entitled to an award of back pay and benefits, front pay, compensatory damages, attorneys' fees, and all other appropriate damages, remedies, and other relief available under the Equal Pay Act.

## COUNT IV

## VIOLATION OF PROCEDURAL DUE PROCESS

## 42 U.S.C. § 1983

98. Ms. Swann restates and incorporates by express reference all preceding paragraphs as if fully set forth herein.

99. Pursuant to the Taylor County Personnel Policies and Procedures Manual, Ms. Swann's employment was only subject to termination based on just cause.

100. And before terminating an employee for just cause, the Taylor County Personnel Policies and Procedures Manual provides that an employee is entitled to a pre-termination hearing.

101. Taylor County, though, did not grant Ms. Swann this fundamental job protection.

102. Rather than providing Ms. Swann the opportunity to state her case at a pretermination hearing, Taylor County forced her to clean out her office within minutes of terminating her for a pretextual reason.

103. Because Taylor County refused to grant Ms. Swann the pretermination to which she was entitled, Ms. Swann is entitled to back pay, front pay, and damages for emotional distress and mental anguish, as well as punitive damages and attorney's fees.

**WHEREFORE,** Ms. Swann demands a TRIAL BY JURY and the following relief:

a. declare that Taylor County has violated Ms. Swann's rights under the federal and state laws listed above;

b. permanently enjoin Taylor County from violating, in the future, Ms. Swann's rights under the federal and state laws listed above;

c. award Ms. Swann full back pay, including all lost pay and benefits, raises, cost of living increases, retirement benefits, and all other lost benefits and compensation reducible to a dollar amount;

d. award Ms. Swann prejudgment interest as required by law;

e. award Ms. Swann compensatory damages for emotional pain and suffering in an amount to be determined by the enlightened conscience of a jury;

f. award Ms. Swann front pay, including all lost future pay and benefits, raises, cost of living increases, retirement benefits, and all other lost benefits and compensation reducible to a dollar amount;

g. award Ms. Swann punitive damages against Taylor County sufficient to punish it for its unlawful conduct and deter it from repeating such conduct in the future, as determined by the enlightened conscience of a jury;

h. award Ms. Swann liquidated damages;

      i.      award Ms. Swann reasonable attorneys' fees and expenses; and

      j.      grant such additional relief as may be just and proper.

Respectfully submitted this 21st day of January 2025.

                                        */s/ Cary R. Burke*
                                        Cary Burke
                                        Georgia Bar No. 757627
                                        LEE MEIER LAW FIRM
                                        695 Pylant Street NE, Suite 105
                                        Atlanta, Georgia 30306
                                        Telephone: (404) 474-7628
                                        cburke@leemeier.law

                                        **COUNSEL FOR MS. SWANN**